MELINDA HAAG (CABN 132612)
United States Attorney

DAVID R. CALLOWAY (CABN 121782)
Chief, Criminal Division

JOHN H. HEMANN (CABN 165823)
MICHAEL MAFFEI (CABN 240978)
Assistant United States Attorneys

    450 Golden Gate Avenue, Box 36055
    San Francisco, California 94102
    Telephone: (415) 436-7246
    Facsimile: (415) 436-7207
    E-Mail: Michael.Maffei@usdoj.gov

Attorneys for the United States of America

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, </br></br> v. </br></br> JOSE SOLTERO, </br></br> Defendant. | No. CR 13-00007-SI </br></br> **UNITED STATES' TRIAL MEMORANDUM** </br></br> Pretrial:   January 22, 2015 </br> Time:      11:00 AM </br> Trial Date: February 9, 2015 </br> Court:     Hon. Susan Illston |

      The trial in the above-captioned matter is set to begin on February 9, 2015, at 8:30 a.m., and the pretrial conference is scheduled for January 22, 20015, at 11:00 a.m.  Pursuant to the Court's Order for Pretrial Preparation, the Government respectfully submits this Trial Memorandum.

**I.    THE CHARGED OFFENSES**

    **A.    Background**

      The defendant, Jose Soltero, is charged in an indictment with five counts of Hobbs Act Extortion, in violation of 18 U.S.C. § 1951(a); three counts of impersonating a federal officer or employee to commit extortion, in violation of 18 U.S.C. §872; and related forfeiture allegations.

//

The evidence at trial will show that beginning sometime in 2009, Eric Tran reported to the FBI that he had been paying "bribes" to a person he believed to be a federal Narcotics Task Force officer. Tran and his associates, all of whom operate marijuana cultivation businesses, collectively paid this individual, later identified as this defendant – Soltero – as much as $500,000 in cash over a three year period to protect Tran's business from attracting the attention of law enforcement and to keep members of their circle from being arrested.

Tran met the defendant sometime around October 2009. At that time, Tran's associate, Kevin Lieu, who later also became an FBI source, was arrested by the Oakland Police Department for cultivating marijuana. Tran and Lieu were introduced to the defendant, who claimed to be a law enforcement officer who could get Lieu's charges reduced in exchange for money. The defendant demanded $50,000 to $100,000 to "fix" Lieu's case. Lieu agreed to pay the defendant $54,000 in exchange for the defendant's "help." Lieu and Tran paid the defendant $10,000 in October 2009, $14,000 in December 2009, and the final $30,000 in February 2010. When it came time for the Alameda Superior Court judge to impose a sentence in the case, Lieu, who expected to receive a custodial sentence, instead received a probation sentence. Lieu believed that the defendant successfully influenced the proceedings. Lieu's assumption was, however, incorrect. Ultimately, when the defendant was arrested in this case, he admitted to receiving the money from Lieu, but claimed that it was only $25,000.

According to Tran and Lieu, the defendant continued to obtain money from them largely through two means: (1) "rent" payment, and (2) payments for "help" with impending arrests or law enforcement raids. "Rent" refereed to monthly payments given to the defendant to protect certain locations from being investigated by law enforcement. "Rent" payments were typically $500 - $1500 in cash, per month. The defendant also demanded, and was provided, certain property as consideration for providing "protection," including cellular telephones, gold kruggerands (a South African gold coin), a vehicle, and a shipping container.

In addition to receiving regular "rent" payments, the defendant also obtained money from Tran and Lieu, and their associates by purporting to advise them when they were under investigation or at risk to be raided or arrested. In these instances, the defendant charged between $10,000 - $100,000 to "prevent" the raids or arrests from occurring. The defendant established and maintained his *bona fides* by providing information about other raids and arrests which proved to be correct.

In May 2010, the defendant told Tran and Lieu that the DEA was going to raid a San Leandro hydroponics store that was owned by one of their associates. The defendant told the two that with a payment of

UNITED STATES' TRIAL MEMORANDUM
Case No. 13-00007 SI                 2

$100,000, he could get the raid cancelled. The associate gave Tran the money, and Tran, in turn, gave it to the defendant. Also around that same time, Tran was arrested for selling marijuana. The defendant solicited $15,000 from Tran for "help" with that case. After the defendant was arrested, he admitted that he solicited and received both the $100,000 and the $15,000 from Tran.

To be clear, the defendant is not, in fact, a law enforcement officer. The defendant is a career confidential informant ("CI") for law enforcement. The defendant has been a CI since approximately 2001. Based upon the defendant's extensive contact with law enforcement in his capacity as a CI, he learned enough about the operations, practices, and lingo of law enforcement that the defendant could capably pass himself off as a law enforcement officer. Furthermore, through his association with law enforcement, the defendant was in a position to obtain information about ongoing investigations.

**B.     Surveillance and Consensual Monitoring of the Defendant**

On August 30, 2011, Lieu met the defendant to pay the monthly "rent." Lieu agreed to allow FBI agents to consensually record this meeting. FBI agents met with Lieu prior to the meeting to give Lieu a recording device, which would capture both video and audio. At that time, Lieu showed the agents an envelope full of cash which Lieu was advised was $1,400 to be given to the defendant for that month's "rent." Lieu met the defendant in the parking lot of While Foods in San Mateo and gave the defendant the envelope of money. FBI agents were present in and around the location to conduct surveillance of the meeting.

During this recorded meeting, the defendant described how he would protect Lieu by having Lieu sign up to be a Confidential Informant (CI). When Lieu asked the defendant whether Lieu would be signing up as a CI with the San Francisco Police Department, the defendant responded: "No, you'll be with us. You'll be going down to Turk, 13th floor, and then you'll sign in and all that bullshit." The defendant's reference to "Turk, 13th floor" is to the FBI San Francisco Field Office.

On September 6, 2011, Tran and Lieu introduced FBI Agents to their associate, Sam Mac, who is also involved in the cultivation and sale of marijuana. They said that within the past week, the defendant informed them that he had spoken to a Drug Enforcement Administration (DEA) supervisor and learned DEA was receiving informant-provided information about Mac's activities. Although the defendant did not demand money then, he later advised Lieu to stay away from Mac. Based upon their prior experiences with the defendant, Tran and Lieu recognized this as the beginning of an extortion demand by the Defendant. The defendant's pattern and

practice for an extortion demand has been to simply drop the name of a person being investigated to Lieu, with the expectation Lieu will convey the information to that person. Eventually, the defendant would offer to stop the law enforcement action against the person in exchange for a sum of money.

Beginning on September 9, 2011, Lieu agreed to consensually record all of his phone conversations with the defendant going forward. FBI agents gave Lieu the equipment to record his calls with the defendant. In the defendant's calls with Lieu, the defendant claimed that Tran and Mac were being investigated by DEA, and that DEA "was going after them big time." The defendant expressed his dismay that Tran and Mac doubted the defendant as of late, and had stopped paying the defendant "rent." The defendant commended Lieu for behaving appropriately by continuing to pay rent, and stated Lieu had not gotten in trouble because Lieu had maintained his regular payments. The defendant stated Tran would be arrested on Thursday, September 15, 2011, and Mac would be arrested on Friday, September 16, 2011. Further, the defendant advised that on the coming Friday the DEA would raid every location associated with Mac, including Mac's parents' home. The defendant stated Tran would have to pay $4,000 to keep from being arrested. The defendant stated Mac would have to pay $45,000 - $55,000 to prevent the entire DEA action, and the defendant compared it to a prior instance where the defendant extorted $100,000 from a different associate of Lieu.

In the same conversation, the defendant suggested that he worked for the FBI, stating, "I don't work for DEA, okay? So DEA, they have their own bosses. My boss? My boss is basically FBI's bosses. He can tell DEA a little about what to do but he doesn't control them. He's not their boss." The defendant confirmed the payment would stop the DEA action, which the defendant would otherwise be a part of.

The calls concluded with the defendant arranging meetings with Lieu on September 14, 2011 to collect the $4,000 from Tran, and on September 16, to collect $13,000 as a down payment to prevent the entire DEA action against Mac. The defendant agreed they could pay the remaining $40,000 in monthly installments. The defendant also demanded Lieu buy the defendant a new Samsung cell phone valued at approximately $150, and a new iPhone valued at approximately $500 to give to a DEA supervisor.

On September 14, 2011, Lieu met the defendant to pay the amount the Defendant demanded in order to prevent the arrest of Tran and raids on his property on September 15, 2011. The payment was $4,000. Lieu agreed to allow FBI agents to consensually record this meeting.

//

When Lieu and the defendant met, Lieu gave the defendant an envelope of money and stated the $4,000 paid on that occasion was to take care of Tran's situation. The defendant confirmed Tran "is taken care of" due to the payment. The defendant stated the payment for Mac was still needed of "[Mac] gets picked up." Lieu told the defendant that Mac was gathering $13,000 to provide to the defendant that Friday. The defendant said "they've been following [Mac] for seven weeks and if [Mac] doesn't get the money, they will hit [Mac]'s house and parents' house." As previously agreed, Lieu gave the defendant the Samsung cell phone and $500 cash for the defendant to purportedly give to a DEA supervisor to purchase an iPhone.

During the meeting, the defendant told Lieu the amount for Mac in total was $48,500. The defendant's "boss" would get $500, and the defendant expected $13,500 to be paid that Friday, and thus Mac would owe $35,00. Lieu said he would try to get another payment before Sunday so everyone will be happy, and the defendant concurred. The defendant pushed for a monthly payment date of the 2nd of every month, and Lieu said that would work as he considered his payment "rent."

FBI agents followed the defendant as he departed from the meeting with Lieu. The defendant drove his Ford pickup to his home in Palo Alto and picked up a small group of people. After making a brief stop, the defendant drove everyone to the Gilroy Premium Outlets. The defendant funded this shopping spree with the money he had just extorted from Lieu. Evidence of these purchases was later found in a search of the defendant's residence.

**C.   Arrest and Search**

Based on the foregoing, the government obtained warrants to arrest the defendant and search his residence and vehicle. Lieu set up a meeting with the defendant on September 16, 2011, for the stated purpose of giving the defendant money for his help with Mac's case. The FBI monitored this meeting, and it took place at the Whole Foods Market in San Mateo. At the meeting, Lieu gave the defendant the $10,000, and the defendant talked about how more money would be necessary to protect Mac from further prosecution. The defendant threatened that Mac's wife would be arrested unless he paid $38,500 more. The defendant made numerous references to law enforcement officers with whom he claimed to work who could either fix Mac's case, or, if not paid, cause additional charges to be filed.

Following the payment, the FBI arrested the defendant in his vehicle. The search of his truck uncovered the $10,000 he had just received from Lieu, and indicia of drug trafficking, including suspected crack cocaine, a

scale, $500 in cash, and three mobile phones. The FBI searched the defendant's house immediately after he was arrested. Among other things, the FBI located (1) a printout of a document showing various terms and phrases used by law enforcement; (2) four gold krugerrands; (3) $30,000 in cash in one hundred dollar bills; (4) $2,024 in cash; and (5) bags from purchases made at the mall in Gilroy on September 14, 2011. Tran and Lieu previously informed the FBI that they had given the defendant gold krugerrands.

### D. The Defendant's Admissions and Attempted Cooperation

The FBI interviewed the defendant following his arrest and again three days later in the presence of his attorney.

After being Mirandized and signing a written waiver, the defendant admitted that he had extorted money from marijuana growers and that he understood that doing so was a crime. The defendant said that a law enforcement officer for whom he acted as a confidential informant had suggested the extortion scheme. The defendant said that he gave a majority of the money he received from Tran, Lieu, and Mac directly to the law enforcement officer, who shared it with other officers and agents.

In the initial interview on September 16, 2011, the defendant admitted he received over $130,000 in extortion money. In the subsequent interview, the defendant admitted that he actually received more than $130,000, and provided a rough account of the times on which he had been paid that the assistance he offered in exchange for the payment – which included "protection" and "help" with pending cases, both of which he claimed were possible through the law enforcement officer.

On September 16, 2011, the defendant placed four consensually-monitored phone calls to the law enforcement officer's cell phone. The first three calls went to voicemail. On the third attempt, the defendant reached the officer and attempted to draw him into conversation by saying he "got the money." The officer did not acknowledge that he understood what the defendant was talking about and asked, repeatedly, where the defendant was and what he was doing.

## II. STIPULATED FACTS

At present, the parties have not stipulated to any facts. The Government has conferred with the defense to see if there may be any stipulations that could streamline the trial, and both parties are currently drafting proposed stipulations.

//

### III.  APPLICABLE LAW

The Government's Proposed Jury Instructions request a combination of the Ninth Circuit Model Criminal Instructions 8.142 (Hobbs Act—Extortion or Attempted Extortion by Force) and 8.142A (Hobbs Act—Extortion or Attempted Extortion by Nonviolent Threat) for Counts One though Five, and a Proposed Draft Instruction for 18 U.S.C. § 872 for Counts Six through Eight, which sets forth the elements and other findings for the crimes charged.

### IV.  OTHER ISSUES RELEVANT TO THE TRIAL

The Government has raised certain legal issues in its motions *in limine*, filed on January 14, 2015. The defendant also filed a motion *in limine* on January 15, 2015, to which the Government has responded separately in other pleadings filed concurrently on the same date as this Trial Memorandum. The Government respectfully requests an opportunity present any additional issues that may arise to the Court's attention.

DATED: January 20, 2015                              Respectfully submitted,

                                                     MELINDA HAAG
                                                     United States Attorney

                                                            /s/
                                                     JOHN H. HEMANN
                                                     MICHAEL MAFFEI
                                                     Assistant United States Attorneys